FÉLIX CARABALLO, Plaintiff and Appellant, *v.* PUERTO RICO ILUSTRADO, INC., ET AL., Defendants and Appellees.

No. 9872. Argued April 21, 1949. Decided July 13, 1949.

*José M. Valentín Esteves* and *Jorge Díaz Cruz* for appellant.
*R. Rivera Zayas, G. Rivera Cestero,* and *Milton F. Rúa* for
appellees.

MR. JUSTICE MARRERO delivered the opinion of the Court.

In the edition of May 26, 1943, of the newspaper "El
Mundo," published in this capital, the following information
appeared:

> "CHARGED WITH HAVING SPLIT A ONE-DOLLAR BILL INTO TWO.
> "A complaint was filed by the Police in the Municipal Court
> of Yauco against Osvaldo Pérez del Rosario, white, 17 years
> old, and Félix Caraballo, white, 45 years old, for the alleged of-
> fenses of false pretenses and cheats. The former was charged
> with having attempted to change a one-dollar bill split into two
> at Banco Crédito y Ahorro Ponceño, Yauco Branch, and the
> latter with having delivered to Pérez del Rosario the said bill
> in order for Pérez to try to change it at said bank.
> "As it will be recalled, in San Juan, a few weeks ago, an
> individual paid to a conductor of a bus his fare to Río Piedras
> with a one-dollar bill from which the reverse side had been
> separated and afterwards in Villapalmeras, he paid to a chauf-
> feur with the obverse. It is unknown whether the individuals
> arrested have any connection with the cases reported in San
> Juan."

Claiming that the publication of the foregoing article re-
ferred to him and that said article had caused him extreme
humiliation, shame, and defamation, Félix Caraballo brought
in the District Court of Ponce an action against Puerto Rico
Ilustrado Inc., José Coll Vidal, and Angel Ramos, claiming
$10,000 as damages. The defendants answered and alleged
that the complaint did not state facts sufficient to constitute
a cause of action; admitted the fact of publication but de-
nied that said publication was maliciously made, and on the
contrary alleged that it was made for justifiable grounds,
without any ill will and that it was a fair and true report of
a police proceeding at the Police Headquarters in Yauco on

May 13, 1943, reported to the General Headquarters of the Insular Police on May 23 of that same year, and published by "El Mundo" in compliance with the duty which said newspaper has to inform the community of the official acts in investigations of criminal or supposed criminal acts with the intention of serving the public interest.

After a trial on the merits, the District Court of San Juan, wherein it was transferred on petition of the defendants, rendered judgment dismissing the complaint with costs.

On appeal the plaintiff assigns only one error. This is to the effect that "the lower court erred in dismissing the complaint in this case on the ground that the publication on which this action is predicated is conditionally privileged and was made without malice, said judgment being contrary to the law, the facts, and the evidence introduced in this case." In discussing this error he first contends that the contents of the publication is not a faithful copy of the source of information which the defendants alleged served them as a basis thereof, but that said information had been altered by them; and that besides, the newspaper added a paragraph of its own accord insinuating that the plaintiff was connected with other crimes of a similar nature committed in San Juan.

The law which governs the matter in this Island is the one approved on February 19, 1902, which appears published at page 309 of the Code of Civil Procedure, 1933 ed. Section 1 thereof creates in the Island of Puerto Rico a civil action for damages for libel and slander. Section 2 provides that: "Libel is the malicious defamation of a person made public by writing, printing, sign, picture, representation, effigy, or other mechanical mode of publication tending to subject him to public hatred or contempt, or to deprive him of the benefit of public confidence and social intercourse, or to injure him in his business, or in any other way to throw discredit, contempt or dishonor upon him, or any malicious

defamation made public as aforesaid, designed to blacken or vilify the memory of one who is dead and tending to scandalize or provoke his surviving relatives or friends," and § 4 that "A publication or communication shall not be held or deemed malicious when made in any legislative or judicial proceeding or in any other proceeding authorized by law. A publication or communication shall not be presumed to be malicious when made: *First.* In the proper discharge of an official duty; *Second.* In a fair and true report of a judicial, legislative, official, or other proceeding, or of anything said in the course thereof; *Third.* To an insular official upon probable cause with the intention of serving the public interest or of securing the redress of a private wrong."

The libelous character of the article published is admitted and the question to be determined is whether the publication was maliciously made and whether by virtue thereof, the defendants are liable in damages to the plaintiff; or whether, on the contrary, in making such publication there was no malice on the part of the defendants if in doing so they were protected by an absolute or conditional privilege, and therefore not liable for any damages.

The evidence introduced in the case tended to show that on or about May 13, 1943, Osvaldo Pérez del Rosario personally went to the Yauco Branch of Banco Crédito y Ahorro Ponceño and requested that a one-dollar bill be changed; that upon one of the employees noticing that the same was mutilated since it had been split into two, he called a policeman who took Osvaldo to police headquarters of that town, wherein Osvaldo stated that the one-dollar bill had been given to him by Félix Caraballo; that Caraballo went to headquarters of his own accord upon hearing what had occurred; that the one-dollar bill was, as a matter of fact, delivered together with other bills to Osvaldo Pérez by Caraballo in payment of an account existing in favor of a third person; that the publication of said article caused plaintiff's financial ruin and even

made him think of committing suicide; that in connection with the matter the Chief of Police of Yauco sent the following written report to General Police Headquarters at San Juan:

"Insular Police of Puerto Rico—District of Yauco, P. R. May 23, 1943.—No. 1,839.—In re: Mutilated Bill, Series 1935A, No. M40482303B, Seized.—To: Chief of Insular Police—San Juan—1—I hereby inform you that on May 13, 1943, at 10 A.M., at Banco Crédito y Ahorro Ponceño, of this town, Osvaldo Pérez del Rosario, white, 17 years old, born in Yauco and a resident at Tendal Street, Yauco, attempted to change a one-dollar bill, SILVER CERTIFICATE No. M40482303B, Series 1935A, legal tender, split into two, damaged when attempting to divide it in two.— 2—Mr. Jacinto Ortiz, Manager of the Bank, informed this office and Policeman Santiago Silva No. 1241 made the investigation and it appeared that Félix Caraballo, white, 45 years old, born in and a resident of Buena Vista Street of this municipality, gave Osvaldo Pérez del Rosario the false and mutilated bill so that Pérez del Rosario would try to change it at the Bank. The bill was seized and a complaint has been filed in the Municipal Court against both for the crime of False Pretense and Cheats. (Sgd.) JOSÉ MARTÍNEZ, District Chief, I. P. 5th class. HEADQUARTERS INSULAR POLICE—RECEIVED May 25, 1943."

That Félix Caraballo was never arrested or accused in the Municipal Court of Yauco by reason of said one-dollar bill and has never been so arrested or accused of any other offense; that the article published was taken by Rafael Gil de Lamadrid from the police blotter at General Police Headquarters of San Juan ; that said article is not a *verbatim* copy of the entry in connection thereto appearing from the said book; and that neither the defendants nor his employee, Gil de Lamadrid, were acquainted with Caraballo.

■ As we have seen, § 4 of the Act authorizing civil actions to recover damages for libel and slander, expressly provides that a publication or communication shall not be held or deemed malicious when made in any legislative or judicial proceeding or in any other proceeding authorized

by law. Publication of such proceedings is conditionally privileged. The privilege arises from the fact, as Mr. Justice Holmes has said in *Cowley* v. *Pulsifer*, 137, Mass. 392, 50 Am. Rep. 318, that "It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed."

 It would be an idle gesture to try to show that an entry in the Police Blotter constitutes a legislative proceeding. Such entry does not constitute a judicial proceeding either. 132 A.L.R. 495; *Lancour* v. *Herald & Globe Ass'n*, 17 A. 2d 253, 259. Nor any proceeding authorized by law. That book is kept in all police districts of Puerto Rico in accordance with Article XLV of the Insular Police Regulations, approved on August 13, 1928, an examination of which immediately convinces us that it does not constitute any kind of proceedings.[1]

Although it has been held that statements made by police officers should in nowise be considered privileged, however, the publication of a correct report of the contents of the books of the Police Department is entitled to a qualified privilege.

---

[1] Section XLV of the Insular Police Regulations, as amended in August 13, 1928, as amended on January 2, 1942, textually recites as follows:

"Rule 1.—In all the Districts of the Insular Police the following books shall be kept:

"(A) AUXILIARY BOOK.

"In this book there shall be entered all events immediately after their occurrence, stating the exact date and hour, and all the details of the case. In addition there shall be recorded the time of arrival and departure of the policemen of the district and the other members of the force reporting thereto because of leave of absence or other causes; there shall be recorded the departure for the country, on foot, horse, bycicle, or automobile and upon their return, the events which occurred and the kilometers traveled; as well as any information or occurrence in connection with the activities of the police. The member of the force who makes

The police blotter has no clear and definite legal status, and according to the authorities as a public record it is an enigma. There are States of the Union in which it is a public record by statute. There are others in which it is considered as a public record by unofficial opinions of the respective Attorneys General and even others in which they are regarded as such by municipal ordinances. There are other States in which the police blotter is not regarded as a public record because of statute, by unofficial opinion of the Attorney General of said States or on the ground of court decisions. There are many others in which the question has not been raised or decided. See Legal Control of the Press by Frank Thayer, 1944 ed., pp. 138 and 139; and The Law of Newspapers by Arthur and Crosman, 1940 ed., p. 204.[2]

█ The privilege to which a newspaper is entitled when publishing the contents of the entries in the Police Blotter is subject to the condition that the publication be a fair and true report of the contents of said Police Blotter. That is why it is stated that privilege is qualified. Legal Control of the Press, *supra;* Law of the Press, by Hale & Benson, 1933 ed., p. 151; Law of Newspapers, by Arthur and Crosman, *supra*, pp. 290–291; Essentials of Libel, by Paul P. Ashley, 1948 ed., pp. 41; Am. Cas., 1917B, p. 424; 33 Am. Jur., pp. 154, 155, 161, §§ 159, 162 and 167; *McClure* v. *Review Pub. Co.*, 80

---

any report in this book, irrespective of his rank, shall state, entitling such report and with red ink, the exact date and hour in which said report is made. Following said heading and with blue or black ink he shall begin the report and upon ending, immediately after the period with which the last sentence is ended, shall write his signature and his class or rank within the Force. The policeman on duty shall be responsible for the neatness and safekeeping of this book. In this book it is conclusively prohibited to write between lines and between each report two blank lines shall be left. The policeman on duty shall enter herein the time in which he raises and lowers the Flag. The Training Officer shall record herein the names of all those attending the academy and the matter taught."

[2] In none of the cases in which this Court has mentioned the Police Blotter it has been specifically decided whether or not it is a public record. See *Rosario* v. *Lalaite*, 55 P.R.R. 191; *Nieves* v. *White Star Bus Line, Inc.*, 49 P.R.R. 70; *Medina* v. *White Star Bus Line, Inc.*, 47 P.R.R. 532; and *People* v. *Viana*, 41 P.R.R. 420.

P. 303; *Morasca* v. *Item Co.*, 126 La. 426, 52 So. 565; 2 Readings in Torts, by Fowler V. Harper, p. 116. Cf. *Burrows* v. *Pulitzer Pub. Co.*, 255 S. W. 925, 929.

 If in the case at bar the information published in the newspaper "El Mundo" is compared with the written report sent by the Chief of Police of Yauco to General Police Headquarters at San Juan, one is readily convinced that the former is rather a faithful and accurate version of the latter. The evidence failed to show, however, that the complaint was as a matter of fact filed in the municipal court, but what the newspaper published did not alter the report of the blotter, since it was so set forth therein.

Qualified privilege comprehends all bona fide communications upon any subject matter in which the author has an interest or with respect to which he has a duty to perform to others. Such privilege is termed conditional because the person availing himself of it must use it in a lawful manner and for a proper purpose. The privilege justifies the communication when made without actual malice. *Pryzant* v. *Gulf Refining Company*, 83 S. W. 2d 752, 753; *Perdue* v. *Montgomery Ward & Co.*, 107 S. W. 2d 12, 14, 341 Mo. 252; *Kilgore* v. *Koen*, 288 P. 182, 194, 133 Or. I. There is no such malice herein.

The newspaper "El Mundo" confined itself, as we have already stated, to publish in its own words what its employee Gil de Lamadrid had copied from the Police Blotter at General Headquarters. He did not assume the guilt of the plaintiff. Although it is true that at the end thereof it added a paragraph recalling that "a few weeks ago, an individual paid to a conductor of a bus his fare to Río Piedras with a one-dollar bill from which the reverse side had been separated and afterwards in Villa Palmeras he paid to a chauffeur with the obverse" and that it also stated that it was unknown if the persons arrested "have any connection with the cases reported in San Juan", it added no additional comment with

respect to Caraballo. The newspaper as public informant, had a right to make fair, true and accurate comments in connection with the news published. 39 Am. Jur. 20, § 31; 33 Am. Jur., *supra*. The comments made by the newspaper were not unfair or false, with the exception that it referred to the arrested individuals and it was actually shown that the plaintiff had not been so arrested. If according to the blotter, a complaint had been filed against Caraballo, the newspaper was entitled to logically infer that he had been arrested. Cf. § 44 of the Code of Criminal Procedure.

The judgment appealed from will be affirmed.